William Wood TURNER, Jr., et al., Plaintiffs-Appellants,

v.

Casper W. WEINBERGER, Secretary of Defense, et al., Defendants-Appellees.

No. 83–1211.

United States Court of Appeals, Fifth Circuit.

April 2, 1984.

Rehearing Denied April 26, 1984.

J. Byron Holcomb, Seattle, Wash., for plaintiffs-appellants.

Betty Jane Anderson, Chicago, Ill., for amicus curiae American Medical Assn.

Charles Ory, Asst. U.S. Atty., Dallas, Tex., LCDR Ronald R. Winfrey, Dept. of the Navy, Alexandria, Va., for defendants-appellees.

Before BROWN, REAVLEY and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

This is a military pay rights case brought by a class of approximately 8,340 military and Public Health Service ("PHS") physicians ("Turner Class") who claim entitlement to incentive pay pursuant to former 37 U.S.C. § 313 (1976). They seek a writ of mandamus directing the Secretaries of the Department of Defense ("DOD") and the Department of Health, Education and Welfare ("HEW") to make the variable incentive payments to the class. The district court granted summary judgment to the Secretary,[1] finding that the payment provision in § 313 was discretionary and that the Secretary did not abuse his discretion by excluding the Turner Class from payments under the statute. We affirm.

## I.

The class members in this action were participants in either the Armed Forces Physicians' Appointment and Residency Consideration Program ("the Berry Plan") or the Commissioned Officers' Residency Deferment ("CORD") Program. The CORD program was the Public Health Service's version of the Berry Plan for those physicians who served in the Public Health Service rather than the Armed Services. These two programs were implemented in 1952 and continued until the draft ended on July 1, 1973. The programs allowed a physician having an obligation for military duty to join the service voluntarily as a reserve officer in his preferred branch of service. In exchange for the enlistment the doctor received a deferment from active duty for a sufficient length of time to complete residency training in a specialty necessary to the military. Upon acceptance to the program, a physician was assigned to the military or the PHS based on the needs of the service and preference of the physician. Each physician incurred a six year reserve obligation and a two year active duty obligation. The objective of the program was to induce physicians during the draft era to join the military with the assurance that their obligation to serve on active duty status would be deferred until they completed their medical training.

Even though the draft ended in July 1973, the Berry Plan physicians were still under legal compulsion to fulfill their two year active duty obligation after completion of their medical training. On the other hand, the CORD physicians were not treated as having such an obligation. If they decided not to fulfill their two year active duty obligation after completion of their medical training, they were simply treated as having resigned from the PHS.

When the draft ended, draft-related recruitment programs such as the Berry Plan and the CORD program became obsolete and were abandoned. In their stead, Congress provided various forms of financial inducement designed to attract qualified physicians to serve in the armed forces. One such inducement was the establishment of Variable Incentive Pay ("VIP") under 37 U.S.C. § 313 (1976). Section 313 authorized the Secretaries of the DOD and HEW to grant variable incentive pay to both military and PHS physicians:

§ 313. Special pay: medical officers who execute active duty agreements.

(a) Under regulations prescribed by the Secretary of Defense or by the Secretary of Health, Education and Welfare, as appropriate, and approved by the President, an officer of the Army or Navy in the Medical Corps, an officer of the Air Force who is designated as a medical officer, or a medical officer of the Public Health Service, who—

(1) is below the pay grade of 0–7;

(2) is designated as being qualified in a critical specialty by the Secretary concerned;

(3) is determined by a board composed of officers in the medical profession under criteria prescribed by the Secretary concerned to be qualified to enter into an

---

1. For simplicity, the appellees will hereinafter be referred to as "the Secretary". HEW has now become two separate cabinet departments—the Department of Education and the Department of Health and Human Services. See P.L. 96–88, 93 Stat. 677–681, 696, codified at 20 U.S.C. §§ 3401, 3441–3447 (1976 & Supp. III 1979).

active duty agreement for a specified number of years;

(4) is not serving an initial active duty obligation of four years or less or is not serving the first four years of an initial active duty obligation of more than four years;

(5) is not undergoing intern or initial residency training; and

(6) executes a written active duty agreement under which he will receive incentive pay for completing a specified number of years of continuous active duty subsequent to executing such an agreement;

may, upon acceptance of the written agreement by the Secretary concerned, or his designee, and in addition to any other pay or allowances to which he is entitled, be paid an amount not to exceed $13,500 for each year of the active duty agreement. * * *[2]

**2.** Note that the variable incentive pay was supplementary to any other pay and allowances received by the qualifying physicians.

**3.** The statute was repealed in 1980. P.L. 93–513, Title IV, § 414(a), 94 Stat. 2906 (1980).

**4.** Department of Defense Directive 1340.11 was adopted on September 5, 1974, to implement the VIP Act. The Army, Navy and Air Force adopted the DOD Directive through regulations which for purposes of this action track that Directive exactly. The service regulations became effective on the following dates: Army, September 21, 1974; Navy, December 6, 1974; and Air Force, January 24, 1975.
DOD Directive 1340.11 provided in pertinent part as follows:
*Variable Incentive Pay for Medical Officers*
   *   *   *   *   *   *
II. *Definitions*
C. *Initial Active Duty Obligation.* The first obligation to serve on active duty for a specified period of time imposed on medical officers by a statute other than section 313 of title 37, U.S.Code (reference (a)), by contract or agreement, or by a regulation issued by the Secretary of Defense or the Secretary of a Military Department. Those officers who entered on active duty, other than under a special procurement program, on or after July 2, 1973, will not be considered as having an initial active duty obligation, and shall not incur such an obligation solely as the result of the commissioning process.
   *   *   *   *   *   *
III. *Policies and Responsibilities*

The Act became effective on May 6, 1974. It was amended in November 1979, to allow payment of the bonus to members of the plaintiff class yet to come on active duty.[3] The purpose of the Variable Incentive Pay Act was to provide a means by which the military and the PHS could attract and retain qualified physicians as an alternative to drafting them.

Pursuant to § 313, the DOD and the Department of HEW promulgated regulations for implementation of the statute. These implementing regulations defined the statutory disqualification of those physicians serving an "initial active duty obligation of four years or less, or the first four years of an initial active duty obligation of more than four years" to include Berry Plan and CORD physicians. 37 U.S.C. § 313(a)(4). Thus, these physicians were precluded from receiving the VIP bonus.[4]

C. A disqualifying active duty obligation is an obligation to enter or remain on active duty incurred as a result of:
   1. An initial active duty obligation of 4 years or less, or the first 4 years of an initial active duty obligation of more than 4 years.
   2. An agreement entered into by an officer in a Reserve component to enter active duty after completion of a period of professional education and training (e.g., Berry Plan, Reserve Officers Training Corps Program, Senior Medical Student Program, Armed Forces Health Professions Scholarship Program).
The Department of HEW implemented the VIP Act by means of Instruction 3, cc22.2 and cc42.2 on July 3, 1974. The HEW regulations provided in pertinent part:
*Personnel Instruction 3—Variable Incentive Pay.*
   *   *   *   *   *   *
Section D—*Eligibility*
2. *Ineligibles.* A medical officer is not eligible for VIP while:
   a. Serving an initial active duty obligation of four years or less, or during the first four years of an initial active duty obligation of more than four years, including obligations incurred under:
   (1) the Commissioned Officer Residency Deferment (CORD) Program,
   (2) the Senior Medical Student (Senior COSTEP) Program,
   (3) an educational program in which the officer attended the qualifying professional

Of the groups which were disqualified from receiving the VIP bonus by the implementing regulations, only Berry Plan and CORD physicians received no financial assistance or subsidies of any kind from the federal government before entering on active duty. The regulations did not disqualify physicians recruited after September 9, 1974, who were not participants in the Berry Plan or the CORD program from receiving VIP on their initial tour of duty. The end result of the VIP implementing regulations, therefore, was that all physicians recruited to serve two years active duty in the military or PHS from sources other than the Berry Plan or the CORD program (or certain other enumerated groups disqualified by the regulations) received $12,500 [5] more per year than the Berry Plan and CORD physicians. After completion of two years of active duty, participants in the Berry Plan and the CORD program were eligible for the VIP bonus during further active duty on the same basis as all other physicians.

The "Turner Class" of Berry and CORD physicians filed suit on July 12, 1977, seeking a declaration that the class was entitled by statute to the VIP bonus. They asked for a writ of mandamus directing the Secre-

tary to make payments to the class. On December 23, 1982, the district court entered judgment granting the Secretary's motion for summary judgment, awarding costs to the Secretary. The class appeals the district court's decision.

## II.

In order to prevail in a mandamus proceeding, the class must establish the existence of the following elements: (1) a clear right to the relief sought; (2) a clear duty on the part of the defendant to do the act in question; and (3) no other adequate remedy available. *Carter v. Seamans,* 411 F.2d 767, 773 (5th Cir.1969). But we recognize that a mandamus in this case would be less extraordinary and more readily issued than the usual writ of mandamus. The only means of review of the administrative action in this case is by way of mandamus. Thus, the parties do not dispute the existence of the critical third element. This action was properly brought under 28 U.S.C. § 1361 (1976), which provides a remedy "in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." [6] The dispute cen-

---

school as a medical officer while on active duty; or
(4) the PHS Scholarship Program.

**5.** The VIP Act gave the Secretary discretion to award a maximum bonus of $13,500 per year to a VIP participant. However, the implementing regulations permitted a VIP participant who contracted to serve only two years active duty to receive $12,500 per year. A participant who contracted to serve four years active duty received the full $13,500 per year permitted under the Act.

**6.** Relying upon *Adair v. United States,* 648 F.2d 1318 (Ct.Cl.1981), the district court properly found that plaintiffs were precluded from bringing this action under the Tucker Act, 28 U.S.C. § 1491 (1976), which provides in pertinent part:

The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliqui-

dated damages in cases not sounding in tort. * * *

In *Adair, supra,* a class of CORD physicians brought an action similar to the case at bar in the Court of Claims under the Tucker Act, seeking a declaration that the CORD physicians were entitled to the VIP bonus. The Court of Claims dismissed the action for lack of jurisdiction. The court based its decision in part on the Supreme Court's decision in *United States v. Testan,* 424 U.S. 392, 396, 96 S.Ct. 948, 952, 47 L.Ed.2d 114 (1976), where the Supreme Court held that the Tucker Act "is itself only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." Thus, recognizing that the Act merely confers jurisdiction upon the Court of Claims whenever the substantive right exists, the *Adair* court determined that § 313 is discretionary rather than mandatory and that the CORD physicians, therefore, had no substantive right to money damages. Consequently, the court concluded that it lacked jurisdiction to entertain the suit.

The district court in the instant case additionally found that it lacked jurisdiction to award damages under the Tucker Act because the

ters on whether the Turner Class had a clear right to the VIP bonus and conversely, whether the DOD and HEW had a clear duty to provide the VIP bonus to class members.

The Turner Class first attempts to establish a clear right to the VIP bonus by arguing that the language of the statute itself mandates payment to the class. The district court properly concluded that § 313 was not a mandatory pay provision, but rather that it gave those charged with implementation of the statute discretion in determining who should be eligible to receive the VIP bonus. This conclusion is supported by the plain language of the statute, by the case law construing the statute, and by the legislative history behind the statute.

■ The statute provides that "[u]nder regulations prescribed by the Secretary of [DOD] or [HEW], . . . a medical officer . . . *may,* upon acceptance of the written agreement by the Secretary concerned . . . be paid an amount not to exceed $13,500 for each year of the active duty agreement." (Emphasis added.) Moreover, the statute expressly authorizes the Secretary to prescribe the criteria under which the VIP selection board is to operate. § 313(a)(3). It is clear that the statute is worded to give the Secretary discretion in determining who should be eligible for the VIP bonus.

In *Adair v. United States, supra,* the Court of Claims was faced with an attack on the PHS implementing regulation for 37

U.S.C. § 313. After reviewing the legislative history of the statute and the underlying policies which prompted its enactment, the court concluded that § 313 was a "discretionary mechanism by which the Secretaries of DOD and HEW could offer pecuniary bonuses. . . ." We agree with the *Adair* court's conclusion that:

> If Congress had intended all DOD and PHS physicians to receive VIP benefits, it simply could have enacted an across-the-board base salary increase. Clearly Congress envisioned that physicians working side-by-side and performing necessarily the same duties, would not necessarily receive the same salary—one might be eligible for VIP while the other was not.

*Adair,* 648 F.2d at 1323.[7] *See also Pardo v. United States,* 648 F.2d 1330 (Ct.Cl.1981).

The Turner Class next argues that even if § 313 is discretionary, the Secretaries of the DOD and HEW abused their discretion in promulgating regulations which construe the statute to exclude Berry Plan and CORD physicians. Appellants argue that their position is supported by the legislative objective underlying the enactment of § 313. They contend that the purpose of the statute was to make military service attractive to physicians serving on active duty by providing them additional monetary benefits. Consequently, in enacting the statute, Congress intended to exclude only those physicians who had already received some monetary benefits in the form of a subsidy from the federal government while completing their medical training.[8]

damages sought by the class are more than $10,000 per class member. *See* 28 U.S.C. § 1346(a)(2).

Given the foregoing, the district court properly concluded that mandamus is the only adequate remedy available to the Turner Class.

7. As the *Adair* court also noted, the congressional history of § 313 indicates that the statute was intended to be discretionary, rather than mandatory. 648 F.2d at 1323 n. 15. For example, during the House floor consideration of the bill, Congressman Hebert stated:

> I want to say in one very emphatic manner that what we do today is not mandatory or compulsory. This bonus in this legislation is permissive. Not one dollar has to be spent [by DOD or PHS] for a bonus for any of these

professions. The [DOD and PHS] in its own judgment can expend the fund.

Congressman Hunt also stated:

> This is not a bill that says, "Now we shall pay this money." This is a bill that is permissive, and it says, "If the money is needed, if the incentive is needed, then the Department of Defense [or PHS] has the leeway to extend to them the added emoluments of money insofar as the bonus is concerned. . . ."

120 Cong.Rec. 9318, 9321 (1974); *ibid.*

8. As previously noted, of the programs disqualified by the HEW and DOD regulations, the Berry Plan and CORD program were the only programs in which the participants did not receive any form of monetary subsidy from the

The district court, however, found that the stated legislative purpose of § 313 was "to attract medical specialists for the military and Public Health Service by substituting monetary inducements for any other compulsion to serve." The district court reasoned that Congress did not intend to include the Berry Plan physicians in the VIP program since they were already obligated to serve two years of active duty at the time § 313 was enacted. The district court's conclusion is well supported by the record and the legislative history of § 313.

As originally proposed by the Senate, the bill which became 37 U.S.C. § 313 contained the provisions which were later codified within §§ 313(a)(2), (3), and (6), but lacked the exclusions which later became §§ 313(a)(4) and (5), pertaining to physicians with unfulfilled active duty obligations and physicians serving as interns and residents. S.Rep. No. 658, 93rd Cong., 1st Sess. 14, 15 (1973). The House Armed Services Committee, however, after learning that the Secretary of Defense intended that medical officers "serving in an initial active duty obligation" would not be considered for variable incentive pay, decided to make that intention explicit in statutory language. The Committee stated:

> The Committee has amended the bill to exclude from the bonus authority those who are serving in an initial active duty obligation and those who are undergoing intern or residency training in the armed forces. The Department of Defense had indicated that this was its intention and the Committee believed it advisable to put such exclusions in law.

H.R.Rep. No. 883, 93rd Cong., 2d Sess. 6, *reprinted in* 1974 U.S.Code Cong. & Ad. News 2923, 2925. This amendment did not conflict with the Senate's original intention, for, as the Conference Committee noted,

> [t]he Senate bill was silent on these provisions, leaving the matter to the administrative determination of the Secretary of Defense. The Department of Defense had indicated its intention not to pay

federal government. They did receive the benefit, however, of a postponement of required

bonuses to interns or those undergoing initial obligated service.

Conference Rep. No. 984, 93rd Cong., 2d Sess. 6, *reprinted in* 1974 U.S.Code Cong. & Ad.News 2923, 2937. Except for inclusion of a provision to limit to four years the disqualification arising from an active duty obligation, the House amendment was adopted by the conferees, as was the House amendment to include Public Health Service physicians on the same basis as their military counterparts.

Thus, it is clear that Congress intended to exclude Berry Plan and CORD physicians from the VIP program. This is plain even from the declaration of the purpose of the bill. As the House stated, the bill was designed to increase the remuneration of armed services physicians "in an attempt to meet the severe problems facing those services in attracting health professionals in an all volunteer environment." H.R.Rep. No. 883, 93rd Cong., 2d Sess. 6, *reprinted in* 1974 U.S.Code Cong. & Ad.News 2923, 2925.

The Turner Class is not the product of an "all volunteer environment." Rather, it is the last vestige of the environment created by the Vietnam-era draft. To extend consideration of a bonus designed for volunteers to physicians who served only because of selective service obligations clearly would be contrary to congressional intent.

The class also attempts to establish a clear right to the incentive payments by arguing that the regulations are unconstitutional. They assert that class members who fulfilled their initial two year active duty obligation after the draft ended in 1973, were in the same position and performed the same medical services as physicians who were recruited under the VIP program after the draft ended. Thus, they argue that class members were denied equal protection of the laws because they were not eligible to receive the VIP bonus while fulfilling the two year active duty obligation which they incurred under the Berry Plan and CORD program while simi-

military service while completing their medical training.

larly situated civilian recruits were given the bonus during the same two year period. It is clear, however, that a distinction exists between civilian physicians whose only inducement to join the military was the variable incentive pay provision and the class physicians who volunteered during the draft in exchange for the guarantee that their active duty obligation would be deferred until after the completion of their medical training.

The legislative objective of the Berry Plan and the CORD program was to induce physicians who were susceptible to being drafted to volunteer in exchange for the assurance that their active duty obligation would be deferred until they completed their medical training. On the other hand, § 313 was enacted to induce physicians who had no legal obligation to enlist to volunteer so that the nation's all voluntary military would be assured of having qualified physicians. The legislative purpose underlying each of these programs is clear and justifies the difference in treatment of civilian physicians and the Berry Plan and CORD participants.

As the district court noted, the legal standard used to evaluate an implementing regulation is whether the challenged regulation bears a rational relationship to the legislative purpose of the enabling statute. *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973); *Thorpe v. Housing Authority of City of Durham,* 393 U.S. 268, 280, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969); *American Trucking Associates, Inc. v. United States,* 344 U.S. 298, 314, 73 S.Ct. 307, 316, 97 L.Ed. 337 (1953). The construction given to a statute by those charged with its administration is entitled to great deference. *Zemel v. Rusk,* 381 U.S. 1, 11, 85

S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). We find that the record evidence and the legislative history of § 313 amply support the district court's conclusion that the regulations implementing § 313 were rationally related to the legislative purpose of the statute.[9]

### III.

■ Special mention must be made of the situation of the CORD physicians[10] since they were released from any legal obligation to fulfill their active duty commitment after the draft ended in 1973. Appellants argue that since the CORD physicians were released from their active duty obligations, they could not be disqualified by section (a)(4) of the statute because they were not serving two years of "an initial active duty obligation of four years or less" at the time the VIP program was instituted.

While the CORD physicians were no longer legally bound to fulfill their active duty commitment after the draft ended, the fact remained that they had committed themselves to active duty in return for the deferment which allowed them to complete their medical training without interruption. If they chose not to fulfill this obligation, they simply were treated as having resigned from the PHS. But if they did serve they did not receive the VIP bonus for two years. Contrary to the class' assertions, the commitment made by the CORD physicians distinguished them from the civilian recruits who were induced to join the military by the VIP program.

It was well within the discretion of the DOD and HEW to treat the CORD physicians' moral obligation to serve on active

9. In making this conclusion, we reject appellants' argument that this Court should adopt the more demanding "substantial relationship test" in deciding whether the challenged regulations are unconstitutional. *See Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). The class' ineligibility for variable incentive pay was not based upon an impermissible classification such as race or sex. *Ibid.*

In *West v. Brown,* 558 F.2d 757, 759 (5th Cir.1977), *cert. denied,* 435 U.S. 926, 98 S.Ct. 1493, 55 L.Ed.2d 520 (1978), we rejected a similar challenge to the use of the "rational relationship" standard in reviewing decisions involving the military.

10. There are approximately 840 CORD physicians in the Turner class.

duty in the same manner as the Berry Plan physicians' legal obligation. In both cases, it is clear that the physicians were induced to join the service by the expectation that they would receive deferment from active duty status and not by any expectation of possible later bonuses such as the VIP.

### IV.

In sum, we conclude that the district court properly found that the regulations promulgated pursuant to 37 U.S.C. § 313 were constitutional and within the scope of the statute. We accordingly affirm the district court's summary judgment in favor of the appellees.

AFFIRMED.