Robert S. HILDERBRAND and Claudia Hilderbrand, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. CV–F–94–5254 REC.

United States District Court,
E.D. California.

May 2, 1995.

Dan W. Lacy Sr., Law Offices of Dan W. Lacy, Talent, OR, for plaintiffs.

Linda Anderson, United States Attorney's Office, Fresno, CA, for U.S.

### ORDER RE CROSS–MOTIONS FOR SUMMARY JUDGMENT

COYLE, Chief Judge.

On April 3, 1995, the court heard the parties' cross-motions for summary judgment.

Upon due consideration of the written and oral arguments of the parties and the record herein, the court issues its rulings as and for the reasons set forth herein.

On March 17, 1994, plaintiffs Robert S. Hilderbrand and Claudia Hilderbrand (hereinafter referred to as plaintiffs) filed a Complaint for Judicial Review seeking judicial review pursuant to 5 U.S.C. § 706(2)(A) of a Farmers Home Administration (hereinafter referred to as FMHA) decision denying plaintiff's Instruction 1951–S application for debt restructuring.

### A. *Governing Standard.*

■ "The court may set aside an agency's order only if its findings or conclusions are arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right or unsupported by substantial evidence." *California Trucking Ass'n v. I.C.C.*, 900 F.2d 208, 211 (9th Cir.1990). As explained in *State of La. ex rel. Guste v. Verity*, 853 F.2d 322, 327 (5th Cir.1988):

> The court is not to weigh the evidence in the record pro and con ... Rather, our role is to review the agency action to determine whether the decision 'was based on a consideration of the relevant factors and whether there was a clear error of judgment.' ....

> Thus, if the agency considers the factors and articulates a rational relationship between the facts found and the choice made, its decision is not arbitrary or capricious ... Indeed, the agency's decisions need not be ideal, so long as it is not arbitrary or capricious, and so long as the agency gave at least minimal consideration to the relevant facts contained in the record.

#### 1. *Augmentation of Record.*

Because both parties, but particularly plaintiffs, submitted by declarations exhibits which were not a part of the administrative record filed with the court, the court was concerned about the extent to which it could consider these declarations and exhibits in conducting the judicial review and ordered the parties to file supplemental briefs addressing this issue.

■ Generally, judicial review of agency action is limited to review of the record on which the administrative decision was based. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d .136 (1971). "The focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1243, 36 L.Ed.2d 106 (1973). However,

as explained in *Love v. Thomas,* 858 F.2d 1347, 1356 (9th Cir.1988), *cert. denied sub nom. AFL–CIO v. Love,* 490 U.S. 1035, 109 S.Ct. 1932, 104 L.Ed.2d 403 (1989):

> We have recognized, however, certain exceptions to the general rule. The court may find it necessary to review additional material to explain the basis of the agency's action and the factors the agency considered ... Moreover, the court may consider, particularly in highly technical areas, substantive evidence going to the merits of the agency's action where such evidence is necessary as background to determine the sufficiency of the agency's consideration ... Nonetheless, the court may not weigh the evidence to determine the correctness or wisdom of the agency's decision.

In the supplemental briefs filed by the parties, they agree that the court may consider almost all of the exhibits and declarations filed by them in augmentation of the administrative record filed with the court. Most of the exhibits either were part of the entire administrative record or are documents from the State and County FMHA files relating to plaintiffs' loan.

There are only two areas of dispute.

The first is with the Lacy declaration filed on February 13, 1995 and with paragraph 2 of the Roberts declaration filed on December 20, 1994. FMHA complains that these averments constitute legal argument which should have been argued in the memoranda. FMHA suggests that the court consider the content of these paragraphs as legal argument and disregard questions of the admissibility of the averments as evidence in this proceeding. Plaintiffs do not object to this suggested procedure.

■ The second area of dispute involves paragraphs 2–5 of the Declaration of Claudia Hilderbrand filed on December 20, 1994.

The court agrees with the United States the contested portion of the declaration should not be part of the administrative record because it is merely a statement of plaintiffs' reaction to defendant's actions.[1]

## B. *Alleged Payment Agreement.*

In paragraphs 7 and 8 of the Complaint for Judicial Review, plaintiffs allege:

> In approximately October, 1990, plaintiffs had filed a Plan of Reorganization which included, among other things, an annual payment to defendant in the amount of $19,057.09. Defendant orally agreed to said payment as a method of retiring plaintiffs' obligations to defendant and thereafter accepted payment in said amount.

### 1. *Background.*

Plaintiffs are farmers who farm real property in Fresno County. This real property secures a Farm Ownership Loan of $175,000 made by FMHA to plaintiffs in 1981. The loan was reamortized on February 2, 1984. Plaintiffs were unable to meet their obligations. On April 30, 1987, plaintiffs filed a petition for bankruptcy pursuant to Chapter 12. On October 26, 1987, Regional Attorney for FMHA, Mr. Lawrence Hom, sent the following letter to then counsel for plaintiffs, Mr. Adrian Williams:

> This letter formalizes the terms that would be acceptable to Farmers Home Administration ... and the debtors if the Chapter 12 is converted to a Chapter 11 proceeding. If the following terms accurately set forth the agreed upon terms, please sign at the space provided below to evidence the debtors' acceptance. However, if you wish to make changes or submit any new terms, then as we discussed you will send me a letter. The agreed upon terms between FMHA and the debtors are as follows:
>
> (1) The Chapter 12 will be converted by the debtors to a Chapter 11. The debtors shall file a Disclosure Statement and Plan of Reorganization ... within 4 months from the date of conversion to a Chapter 11. In the event the Disclosure Statement and Plan are not filed by the end of the four month period following the Chapter 11 conversion date, FMHA is entitled to automatic relief from stay to foreclose

---

1. The court also asked the parties to address whether administrative remedies had been exhausted. The parties agree that they have been. From the court's review of the administrative record, the court agrees.

without the need to obtain any Bankruptcy Court order granting relief from stay.

(2) FMHA is not committed to acceptance of the Plan. FMHA is free to vote and accept or reject the Plan, and also to object to any provision contained in the Disclosure Statement and Plan that it finds is unacceptable.

(3) FMHA will not object to terms of the Plan calling for FMHA's secured claim consisting of a first deed of trust lien against debtors' real estate valued at $188,000 with interest rate at 9.5% on the $188,000 FMHA secured claim. Further, the debtors will make semi-annual payments for a term of 25 years.

(4) The debtors will make payments to FMHA semi-annually on the last Friday in March and November. FMHA will inform debtors of the exact amount owing on these dates prior to the payment date. The debtors may make a first payment owing to FMHA in November, 1987 and subsequent payments, even if the Chapter 11 Plan has not yet been filed or confirmed.

(5) The Plan will provide that upon 10 days notice to the Bankruptcy Court after debtors' default in any payment owing the FMHA, FMHA will have automatic relief from stay to accelerate the debtors account and to file for record the notice of default concerning debtors' real property liened to FMHA.

Further, the Plan will provide that during the 120 days following the date of debtors' default to FMHA, the debtors may sell the secured real property to fully pay off FMHA's secured claim plus interest.

Further, the Plan will provide that FMHA will be given automatic relief from stay, without any need to seek a court order, to foreclose on the debtors' real property at the end of 120 days from the date of debtors' default in payment to FMHA, if debtors have not during the 120 days following debtors' default either sold the property to fully pay FMHA's secured claim with interest or properly cured the default.

(6) FMHA's unsecured portion of its total claim against debtors will receive distribu-tions in the Plan's payments to unsecured creditors. FMHA reserves the right to object to the Plan's treatment of FMHA's unsecured claim.

This letter was signed by Mr. Williams "on behalf of debtors, whereby debtors fully agree with the terms specified above."

Plaintiffs' bankruptcy was converted to a Chapter 11 in November 1987. The first Plan was not filed by plaintiffs until August 1, 1989, i.e., after the four month deadline agreed to in the October 26, 1987 letter.

On June 7, 1988, Mr. Hom wrote to Mr. Williams, stating in pertinent part as follows:

In your letter dated April 11, 1988, you requested a completed mortgage from ... FMHA ... so that the mortgage can be included in the debtors' Chapter 11 Plan. FMHA does not have any authority under its regulations to provide a new deed of trust. Instead, FMHA will retain the original deed of trust ... Further, FMHA will also retain the original promissory noted. . . .

Upon confirmation of the Plan, FMHA will reamortize its promissory note. The amount of the reamortized note will be equal to the FMHA secured claim as ordered by the U.S. Bankruptcy Court under the confirmed Plan. Once the FMHA secured claim is paid in full, then FMHA will release its original and reamortized promissory notes and will also issue a full reconveyance on its May 1, 1981 deed of trust.

A handwritten document captioned "P.C." and dated 8/[undecipherable]/89 included in the administrative record states in pertinent part:

U.S. Attorney, Larry Homs called to talk to Richard. I listened to the conversation regarding B's bankruptcy and the proposal for Chapter 11 plan. According to Larry, U.S. Attorney's office on behalf of ... FMHA, agreed to a debt restructure of B's delinquent account sometime in November 1988. Larry is of the opinion that 'FMHA' may accept the plan 'as is', which calls for a yearly payment of $18,000 at 9¼% for 32 years under the plan with a balance of $189,000 as B's R–E Debt balance to 'FMHA'. However, he states that 'FMHA'

may object to the plan and demand that accrued interest since January 1, 1989 be included in the payments plus a 'drop dead' clause be added to protect FHMA's future security interest in the event that B's does not comply with the plan payment requirements after court approves such a plan. Richard thought that such an idea would be nice. Meanwhile, we are awaiting state office reply to a memo sent to them on 8/7/89 regarding this bankruptcy.

In the margin of this memorandum there is the name "Steve". However, there is no indication who wrote this memorandum.

On September 5, 1989, Darrel G. Zerger, Chief of the Farmer Programs, in Woodland, California, sent a memorandum to Mr. Hom. The memorandum states in pertinent part as follows:

We are enclosing copies of the following documents for your review and advice:

1. 'Application For Order Directing Fixing and Filing of Claims and Order Thereon' Creditors have 60 days to file a 'Proof of Claim'. Enclosed for immediate filing is an FMHA claim. FMHA is a class IV creditor under this application and the FMHA debt, as of April 30, 1987, exceeds the $188,000 disclosed in this document.

2. 'Notice of Motion for Hearing Re: Approval of Disclosure Statement and Acceptance of Plan' The hearing will be held on September 18, 1989 at 2:00 a.m. in the Fresno Bankruptcy Court.

3. 'Motion for Approval of Disclosure Statement and Acceptance of Plan Points and Authorities and Declarations'.

4. 'Disclosure Statement' FMHA is once again defined as a class IV creditor.

5. 'Ballot For Accepting Or Rejecting Plan' FMHA's recommendation relevant to the ballot will be set forth later on in this memorandum.

6. Appraisal of 67.89 acres completed by Briggs Realty dated September 8, 1987 in the amount of $167,500.

7. 'Debtors Plan of Reorganization' We have several comments related to the 'Plan'. They are:

a. On page 2, line 20, FMHA is classified as a class IV creditor. It would appear that we are also an impaired secured creditor, in addition, to being an undersecured creditor.

b. On page 3, Article III—Treatment of classes that are impaired under plan makes reference that FMHA is a class III Creditor. It further states that 'FMHA is to be paid, the exact terms, interest rate, duration of loan, and balance due will be determined by this court in accordance with a subsequent reamortization ordered by this Court. Approximate payment of $17,482.50 per year on a principal balance due of $189,-000 at 9¼ percent over a 32 year period'. This is substantially less than the present market value of the real property. According to the Fresno FMHA County Supervisor the contract appraiser found a value of $208,000 as of May 17, 1989.

Term number 3 of this memorandum indicated that 'FMHA will not object to terms of the Plan calling for FMHA's secured claim consisting of a first deed of trust lien against debtors real estate valued at $188,00 [sic] FMHA secured claim'. It is our opinion that this agreement is void, since the debtor did not comply with term number one of the memorandum when they failed to file a Chapter 11 plan within 4 months from the date of Chapter 11 conversion.

We also recommend a one year reduction in the proposed repayment term to allow the debt to be repaid within the original 40 year term. The proposed interest rate is acceptable at 9.25 percent. There is not a disclosed date for annual payment. FMHA will also be a class IV creditor, but it is unlikely we would receive any payment on our unsecured risk.

The debtor applied for servicing under the 1987 Ag. Credit Act. The Fresno FMHA County Supervisor has verbally apprised us that the request for primary servicing was not viable and the debtor's counsel was so informed. The Net Recovery Buyout figure is $150,427 using the original net recovery constant and $176,608 using the new constants.

The Fresno staff makes a strong point that FMHA should vote in favor of the plan as

the alternatives may be less desirable. We recommend that the debtors counsel be advised of FMHA's objection to the proposed FMHA loan balance under the plan. Unless they are willing to amend the plan, the Agency recommends rejection of the plan. It would appear that the Agency is entitled to adequate protection.

The record before the court includes a handwritten memorandum dated September 18, 1989 concerning a telephone conversation the author of the memorandum had with Mr. Hom. The memorandum states in pertinent part:

He has spoken with the debtor attorney. The attorney does not believe that there has been much change in value since 1987. Larry suggests a compromise at $198,500 ($189,000 vs. $208,000). The debtor attorney is willing as based on the Fresno County [undecipherable] track record on values. I advised him we would not object. Look at $198,500 at 9½ over 31.

He will call Richard directly to discuss.

Again, there is no indication who is the author of this memorandum.

Included in the record before the court is a handwritten note dated September 18, 1989 stating: "FMHA will agree to accept per U.S. Atty./Rich (1) $198,000 debt bal. (2) 31 year term (3) 9¾% interest". There is no indication who is the author of this note.

Another handwritten memorandum, dated February 1, 1990, is included in the record before the court. This memorandum states:

P/C from Larry Hom. He said borrower's attorney has called him. He is proposing Plan of reorganization which will include $198,500 secured FMHA debt at 9% for 29 years. The remaining FHMA debt will be treated as unsecured debt and FMHA will receive pro-rata share of $60,000 payment which they are proposing the debtor will pay to unsecured creditors over the plan period. Larry and I agreed to the terms of the propose plan of reorganization.

By letter dated February 12, 1990 from Mr. Williams to Mr. Hom, Mr. Williams encloses "the 1989 land payment for Steve Hilderbrand Farms."

A memorandum dated February 15, 1990 from Mr. Hom to Gurcharan S. Dhillon, Farmer Program Specialist, FMHA State Office, Woodland, states in pertinent part as follows:

I enclose a copy of the letter dated February 12, 1990 along with the $19,075.09 check which I received from Mr. Adrian S. Williams, debtors' counsel. As we discussed by telephone, the debtors will file their 1st Amended Plan whereby FMHA's secured real estate claim will be $198,500, payable at 9 percent interest rate over a 32 year period. These terms are acceptable to FMHA.

A memorandum dated March 1, 1990 from the State FMHA Office to the FMHA County Supervisor in Fresno, states in pertinent part:

We are forwarding you a check for $19,075.09 with a copy of the memorandum from the Office of the General Counsel. The memorandum describes the terms and conditions of the agreement reached between the borrower's Attorney and the Office of General Counsel. Please apply the payment to the borrower's account and monitor the receipt of future payments in accordance with the terms described in the attached memorandum.

A Fifth Amended Disclosure Statement with Plan of Reorganization attached was filed in October, 1990. This document provided in pertinent part:

Class IV is FMHA and FMHA's payment is to be made from the farming proceeds in accordance with the terms and conditions to be approved by this Court in the Plan, based upon a total loan ... $198,500.00 ... over a period of ... 32 ... years, with an interest of ... 9% ..., leaving a yearly payment of ... $19,075.09 ... to be made on December 15th of each year, including the five years of the Plan.

A copy of a Notice of Continued Motion for Approval of Fifth Amended Disclosure Statement, apparently filed in plaintiffs' bankruptcy proceedings in early November, 1990, contains a handwritten notation that "FMHA claim same as [undecipherable] Amended Plan. FMHA claim not disputed claim." Al-

though there are initials on the notation, the court cannot read them.

The record before the court includes a document captioned "Reminder of Payment to be Made" sent to Mr. Williams from the Fresno office of FMHA dated November 2, 1990. The document refers to plaintiffs' Chapter 11 proceeding and states that "[a]ccording to our records, you agreed to pay the following". The document refers to loan number 41–02, states that the amount of the payment is $19,075.09, and that the interest rate is 9%. The document further states that this amount is due on or before January 1, 1991.

A memorandum dated November 26, 1990 from Darrel Zerger to the FMHA County Supervisor in Fresno states in pertinent part:

Thank you for your memorandum dated October 22, 1990 and October 23, 1990. We have carefully reviewed them and the 'Order Fixing Time for Filing Claim.'

The borrower's attorney and Mr. Larry Hom of the Office of General Counsel has discussed and established the amount of the Farmers Home Administration claim. The Fourth Amended Plan, filed by the borrower, correctly listed the FMHA loan balance at $198,500 and the repayment terms as negotiated by the borrower's attorney and Mr. Hom. Since the FMHA claim is not a disputed claim, it is not necessary to file a Proof of Claim.

If the borrower files a new disclosure statement, please review the disclosure statement carefully to ensure that the FMHA loan amount and terms are exactly the same as described in the Fourth Amended Disclosure Statement.

The record before the court includes a handwritten document captioned "Running Record" which states in pertinent part:

12/11/90 [undecipherable] Attended bankruptcy court for R.S. Hilderbrand. Re:

(1) Con't of Disclosure Stmt # 5

(2) Con't Motion to Approve Atty fees

(3) Con't Motion to Dismiss, Convert, etc.

The disclosure statement was not approved—objection from IRS. The plan was $500.00 off and the plan showed points over 5 years instead of 3. Atty has agreed

to change this. Objection by Simplot Soilbuilders—they claim that they were a secured creditor—after discussion the objection was withdrawn. Judge Dorian had other problems with the plan:

—liens were not described

—no total amount of liabilities

—an increase in unsecured creditors (405–530) has occurred with no explanation

—plan does not account for @ $530,000 in expenses for crop (only 176,000 from Anderson Clayton)

Continued to January 15 @ 10:00 a.m.

Atty Red Williams also stated that FMHA has agreed to wipe out the deficiency. (?).

Again, there is no indication on the document of the author although it appears from other documents that the author must be Shannon Pearson, Assistant County Supervisor, Fresno Office.

The record includes another handwritten document captioned "Running Record" which states in pertinent part:

Jan. 15, 91 [undecipherable] Attended bankruptcy court for Hilderbrand case. Judge Dorian did not approve of the Chpt 11 plan—the case was dismissed.

. . . . .

Jan 17, 91 [undecipherable] sent memo to S/O re: above

A memorandum dated January 17, 1991 from Shannon Pearson, Assistant County Supervisor, Fresno Office, to Farmer Programs, State Office, states in pertinent part as follows:

The chapter 11 bankruptcy . . . was dismissed by the Bankruptcy Court on January 15, 1991. According to Attorney Red Williams, Larry Hom has requested that he forward the stipulation and waiver to OGC. Apparently the agreement made between the Hilderbrands and OGC may be implemented even though the bankruptcy has been dismissed. (?). A copy of the dismissal of debtor will be forwarded to the state office as soon as it is received.

The Fifth Amended Disclosure Statement with Plan of Reorganization was not confirmed by the Bankruptcy Court. The Chap-

ter 11 bankruptcy was dismissed on January 23, 1991.

On February 13, 1991, Mr. Williams wrote to Mr. Hom, advised him that the bankruptcy had been dismissed and requesting Mr. Hom to "contact me regarding our previous offer to repay the Farmer's Home loan." On April 9, 1991, Mr. Hom responded:

> In response to your letter dated February 13, 1991, please be informed that since the borrower's Chapter 11 case has been dismissed, Farmers Home Administration ... is unable to restructure the FMHA debt based upon the terms of the Chapter 11 Plan.
>
> I recommend that you encourage your client to exercise his rights under the FMHA servicing regulations. Please be advised that the FMHA County Office in Fresno is proceeding to service this account in accordance with FMHA's servicing regulations.

An FMHA borrower who defaults on his FMHA farm loans is entitled to apply for debt restructuring and loan servicing pursuant to 7 U.S.C. § 2001 and 7 C.F.R. Part 1951, Subpart S, §§ 1951.901–1951.914. These rights are known as "FMHA Instruction 1951–S loan servicing rights."

On April 4, 1991, plaintiffs informed FMHA that they wanted to apply for preservation loan service programs under FMHA Instruction 1951–S. On May 6, 1991, plaintiffs signed a letter Request for Preservation Servicing Options, requesting voluntary conveyance of the secured real property to FMHA with a combination of a five-year leaseback and buyback of the property with FMHA financing. This request was denied on July 3, 1991 because of an asserted "failure to respond to FMHA Instruction 1951–S, attachments 9 & 10 with a complete application by the deadline outlined in our letter dated May 22, 1991." Plaintiffs' appealed this decision to the FMHA Appeals Staff. On October 17, 1991, the Hearing Officer reversed this decision. In addition, the Hearing Officer further stated in pertinent part:

> The issue you and your attorney discussed during the hearing, regarding the payment agreement that was negotiated during your bankruptcy proceeding with Larry Hom, is considered non-material to this appeal and decision. The negotiations for that payment agreement were initiated as a result of the filing of the bankruptcy for the purpose of preparing a plan to be approved by the court. The record shows the plan was negotiated by you through your Attorney, Mr. Williams, and FMHA by Mr. Hom from OGC, with the intent to maintain a viable farming operation, protect the FMHA security interest, and pay other creditors, all to the satisfaction of the bankruptcy court. This plan was never approved by the court, and the bankruptcy was dismissed. Therefore, the plan could not be implemented. Instead, as discussed above, your status was returned to that of a borrower who had never filed bankruptcy and you were entitled to all servicing options according to FMHA Instruction 1951–S.

### 2. *Judicial Review.*

#### a. *Clarification of Record.*

Before addressing the substantive merits of the parties' respective positions concerning the existence and enforceability of an alleged agreement, there is some confusion in the parties' papers that needs to be clarified.

In its opening brief, the United States, relying on its construction of a statement in the Joint Scheduling Report filed on June 29, 1994, argues that plaintiffs are contending that there was a repayment of debt agreement entered into with FMHA in 1987. The United States asserts that the only such agreement is the October 26, 1987 letter between Mr. Williams and Mr. Hom and then proceeds to argue the merits of this review based on the October 26, 1987 letter.

However, the Joint Scheduling Report actually states in pertinent part:

> Plaintiffs contend that the FMHA's decision to deny them servicing was arbitrary and capricious because they demonstrated that they could feasibly retire the outstanding obligation pursuant to an agreement entered into with FMHA in the context of a bankruptcy proceeding filed by the plaintiffs in 1987. Therein, a deal was

entered into and consummated by way of a payment from plaintiffs to defendants, pursuant to which plaintiffs agreed to pay $19,075.09 annually to retire the debt. FMHA accepted the initial payment from plaintiffs pursuant to said agreement. Because of assurances from FMHA, plaintiffs voluntarily dismissed their voluntary petition in Bankruptcy in 1991.

Nothing in this statement indicates that plaintiffs based their allegation of an agreement on the October 26, 1987 letter. It is clear that plaintiffs were referring only to the fact that they filed a petition in bankruptcy in 1987. Plaintiffs' briefs make clear that they are relying on the series of letters and memoranda quoted above as well as the one payment in contending that there was a valid and enforceable agreement to repay the debt between plaintiffs and the FMHA.

In contending that the FHMA entered into the payment agreement described in the Fifth Amended Disclosure Statement with Plan of Reorganization attached (hereinafter referred to as the Fifth Plan), plaintiffs rely on the fact that the FHMA did not object to the proposed plan and the fact that the FMHA accepted payment of $19,075.09 in 1990.

### b. *Choice of Law.*

In their initial briefs, plaintiffs contended, without any citation of authority, that "[i]t seems clear that the circumstances relating to this matter must be interpreted in light of California law." FMHA initially responded that the court has already determined in the Scheduling Conference Order filed on August 24, 1994 determines that this issue is governed by federal law. The Scheduling Conference Order provides that it is not contested that Federal substantive and procedural law applies to this case. Because of this disagreement and the lack of any substantive authority provided by the parties, the court ordered the parties to file supplemental briefs specifically addressing the choice of law issue and setting forth legal authority supporting their respective view of the law which should be applied to determine the formation and/or interpretation of the alleged agreement. The parties have complied with the court's order.

The United States Supreme Court has held "that federal law governs questions concerning the rights of the United States arising under nationwide federal programs." *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979). In addition, 7 C.F.R. § 1900.102(a) provides that "[i]nstruments evidencing or securing a loan payable to or held by the Farmers Home Administration, such as promissory notes, bonds, guaranty agreements, mortgages, deeds of trust, financing statements, security agreements, and other evidences of debt or security shall be construed and enforced in accordance with applicable Federal law."

However, in *American Intern. Enterprises, Inc. v. FDIC,* 3 F.3d 1263, 1268–1269 (9th Cir.1993), a case deciding whether the district court erred in applying the California Statute of Frauds to the plaintiff's complaint against the FDIC for damages resulting from the alleged breach of an oral commission agreement, the Ninth Circuit explained:

The parties ... have not referred us to any federal statute setting forth the rule of decision in this case. Accordingly, we are 'free to apply the traditional common law technique of decision and draw upon the sources of common law.' ... AIE urges us to create a uniform federal law which does not require a real estate commission agreement to be in writing. FDIC, on the other hand, contends the district court was correct in adopting the California Statute of Frauds, which prohibits the enforcement of oral commission agreements, as the controlling federal rule in this case. A review of the principles involved in this decision leads us to affirm the district court's choice of law.

'Controversies directly affecting the operations of federal programs, although governed by federal law, do not inevitably require resort to uniform federal rules.' ... 'Frequently, state rules of decision will furnish an appropriate and convenient measure of the governing federal law.'
....

"Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy 'dependent upon a variety of

considerations always relevant to the nature of the specific government interests and to the effects upon them of applying state law.' " ... Under the three-part test established in *Kimbell Foods,* we must determine "(1) whether the issue requires 'a nationally uniform body of law"; "whether application of state law would frustrate specific objectives of the federal programs"; and (3) whether "application of a federal rule would disrupt commercial relationships predicated on state law." ' ... 'The federal courts will formulate a federal law that supersedes state law only when it relates to federal programs and actions where "[t]he desirability of a uniform rule is plain." ' ....

Here, both plaintiffs and defendant now agree that federal law must be applied to the resolution of the issues.

However, defendant argues that the court should, as the Ninth Circuit did, apply California's Statute of Frauds. Defendant does not address the choice of law with respect to issues of formation and construction of the alleged agreement, i.e., such as the parole evidence rule.

Plaintiffs, on the other hand, merely argue that California law should be applied to all of these issues in the absence of a governing federal law involving the construction and application of contracts with a government agency. However, plaintiffs provide no authority that there is no such law.

Nonetheless, because the parties appear to concur that California law should govern, the court will analyze and resolve the contract issues under California law.

### c. *Statute of Frauds.*

■ As noted, the Complaint alleges that the agreement between plaintiffs and the FHMA was oral. The record recited above does not reveal any written agreement between the parties encompassing the terms argued by plaintiffs. Because this alleged contract is "[a]n agreement that by its terms is not to be performed within a year from the making thereof", it is within the Statute of Frauds. California Civil Code § 1624(a).

Therefore, the oral agreement alleged by plaintiffs is invalid unless it "or some note or memorandum thereof, [is] in writing and subscribed·by the party to be charged or by the party's agent...." Section 1624.

Plaintiffs argue that the series of notes and memoranda quoted above satisfy this requirement because these notes and memoranda have been prepared and/or signed by various agents of the FMHA.

California authorities generally agree that a writing is sufficient to satisfy the Statute of Frauds if the writing (a) reasonably identifies the subject matter of the contract, (b) is sufficient to indicate that a contract with respect thereto has been made between the parties or offered by singer to the other party, and (c) states with reasonable certainty the "essential terms of the unperformed promises in the contract." Restatement 2d, Contracts § 131; Witkin, 1 *Summary of California Law,* p. 267 (9th Edition). As further explained in Witkin:

> Although the use of the word 'subscribed' would ordinarily indicate a requirement that the signature appear at the *end* of the instrument, it has generally been held to be the practical equivalent of '*signed.*' This has been the view in California as to *contracts* and *holographic wills.* Hence the name of the party may be at the beginning or in the body of the instrument, if it clearly appears that it was intended as a signature, i.e., as an authentication....
>
> On the other hand, if the name appears to be placed thereon for some other purpose, as for mere identification, this will not satisfy the statutory requirement.
>
> .     .     .     .     .
>
> 'The signature to a memorandum may be any symbol made or adopted with an intention, actual or apparent, to authenticate the writing as that of the signer.' ....

Thus, it is not essential that a person's *legal* name be signed. Nicknames, initials, or intimate descriptions such as 'mother' or 'dad' may be sufficient, provided that they were intended as the equivalent of legal signatures.

Given these standards and the record before the court, it is arguable that the Statute of Frauds was not violated. However, reso-

lution of this issue in plaintiffs' favor does not compel summary judgment for plaintiffs. *See* discussion *infra.*

### d. *Failure to Object.*

■ Turning to plaintiffs' contention that FHMA did not object to the Fifth Plan and accepted one payment, plaintiffs cite no authority supporting an implication that these acts or omissions can bind the FMHA in a contract as argued by plaintiffs. It is noted that 7 C.F.R. § 1962.47(c), governing adjustment of debts when debtors are in bankruptcy, provides:

FMHA personnel do not have the authority to accept or reject a reorganization plan on behalf of the United States for debtors filing under Chapter 11, 12, or 13 when the plan calls for part of the FMHA debt to be cancelled.

(1) Plans submitted by debtors under chapters 11, 12, and 13 must be sent to the State Director who will refer them to the United States Attorney through the Regional Attorney. When the plan calls for the adjustment of a debt to FMHA, the State Director will provide the Regional Attorney with a recommendation on acceptance or rejection of the plan.

(2) The U.S. Attorney will advise the FMHA State Director through the Regional Attorney as to approval or rejection of the debtor's reorganization plan. Upon notification of an approval, the State Director will notify the Finance Office by memorandum of the terms and conditions of the bankruptcy reorganization plan including any adjustment of the debtor's debt.

Here, the evidence quoted above indicates that this regulation was not fully complied with. Although there are indications that the U.S. Attorney advised someone at the FMHA that the proposal was approved and no objection to the Fifth Amended Plan was made by the FMHA, there is no indication of which the court is aware that the State Director ever notified the Finance Office of the terms and conditions of the bankruptcy plan including any adjustment of the debt.

### e. *Failure to Confirm Plan.*

This conclusion ties into another issue in this matter, the failure of the bankruptcy court to approve the Fifth Amended Plan and the subsequent dismissal of the bankruptcy.

Plaintiffs argue that none of the above-quoted documents evidence a condition that the agreement be approved by the bankruptcy court.

The court does not agree. It is apparent from a review of all of these documents that approval of the Fifth Amended Plan by the bankruptcy court was anticipated by the FMHA.

■ Moreover, the dismissal of the bankruptcy without approval of the plan is fatal to plaintiffs' claim. 11 U.S.C. § 349(b)(3) provides in pertinent part:

Unless the court, for cause, orders otherwise, a dismissal of a case other than under section 742 of this title—

.    .    .    .    .

(3) revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title.

"The objective of section 349(b) is to restore all property rights, as far as practicable, to the positions they occupied at the commencement of a case that was dismissed under one of the operative sections of Title 11." 2 *Collier on Bankruptcy,* ¶ 349.03 (15th Ed.). Therefore, the dismissal of the bankruptcy without approval of the plan of reorganization means that plaintiffs and the FMHA returned to the status quo prior to the filing of the bankruptcy.

■ Plaintiffs argue that confirmation of the plan was unnecessary because, after the agreement was formulated, liquidation was no longer necessary.

In making this argument, plaintiffs appear to imply that the FMHA was the only creditor, therefore making approval of the plan unnecessary.

However, the court has reviewed the Fifth Amended Plan set forth in the administrative record. There were a number of other credi-

tors who were to receive specified payments pursuant to the plan if the plan was approved. Therefore, the failure to get the plan approved and the dismissal of the bankruptcy cannot be seen as meaningless as plaintiffs appear to imply.

■ Plaintiffs may be attempting by this argument to circumvent 7 C.F.R. § 1962.47(d)(2). Section 1962.47(d)(2) provides in pertinent part:

If a bankruptcy is dismissed and liquidation of the account is necessary, liquidation will be accomplished in accordance with § 1962.40 of this subpart and § 1965.26 of subpart A of part 1965 of this chapter as appropriate. The borrower will be notified of FMHA's servicing options by the notices required by subpart S of part 1951 of this chapter. The borrower's attorney of record will be sent a courtesy copy of the notices when they are sent to the borrower.

As noted above, this is exactly what happened in this action. Plaintiffs further refer to the two memoranda prepared by Shannon Pearson, quoted above, in which she states: "Apparently the agreement made between the Hilderbrands and OGC may be implemented even though the bankruptcy has been dismissed. (?)."

However, it is clear from this notation that Pearson was not stating a fact but, rather, posing a question. Therefore, this statement cannot be considered evidence that the FMHA considered any agreement between plaintiffs and the FMHA to be effective notwithstanding the failure to approve the plan and the subsequent dismissal of the bankruptcy.

■ Plaintiffs further argue that the acceptance by the FMHA of the $19,075.09 payment from plaintiffs in February, 1990 and the billing for another payment in November, 1990 is evidence that the agreement existed and survived the dismissal of the bankruptcy.

However, the court concludes that these events are not supportive of plaintiffs' position. As noted, both occurred prior to the dismissal of the bankruptcy without the confirmation of the plan. Once the bankruptcy

was dismissed, plaintiffs were advised of their rights pursuant to Section 1962.47(d)(2). In any event, dismissal returned the parties to the status quo ante.

### f. Conclusion.

Consequently, the court cannot conclude from the record before it and the arguments of the parties that the FMHA hearing officer's decision was "are arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right or unsupported by substantial evidence."

### C. Denial of Debt Restructuring.

■ The FMHA is a comprehensive farm and rural development agency authorized to make various kinds of loans, including farm loans, to farmers and rural residents. FMHA's principal purpose is to function as a "form of social welfare ... primarily designed to assist farmers ... [who] cannot obtain funds from private lenders on reasonable terms." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 735, 99 S.Ct. 1448, 1462, 59 L.Ed.2d 711 (1979).

The Agricultural Credit Act of 1987 provides that "[i]n considering a borrower for loan servicing programs, the Secretary shall place the highest priority on the preservation of the borrower's farming operation." 7 U.S.C. § 1981d(e). 7 U.S.C. § 2001(c)(5) provides that the FMHA is required to restructure a farmer program borrower's debt if it will cost the government the same amount or less to proceed with foreclosure. In order to determine whether the FMHA will receive more upon restructuring of the debt than upon foreclosure or liquidation, the FMHA is required to calculate the liquidation recovery value of the collateral securing the loan and the present value of the payment stream of a restructured loan. 7 U.S.C. § 2001(c). If the borrower can service a restructured loan with a present value that is greater than or equal to the liquidation recovery value of the collateral, FMHA must restructure the loan. 7 U.S.C. § 2001(c)(5). If servicing the restructured loan is impossible, the borrower has the op-

portunity to buy out the property for the amount of the recovery value to FMHA for 90 days following notification of the denial of restructuring. 7 U.S.C. § 2001(c)(6).

In order to process a restructuring application, the FMHA requires detailed information from the borrower concerning the operation of the farm on a Farm and Home Plan. 7 C.F.R. § 1951.909; FMHA Form 431–2. The information provided on the Farm and Home Plan is processed through a computer program entitled "Debt Adjustment and Loan Restructuring System" also known as DALR$. DALR$ computes the present value of the restructured loan and the recovery value of the collateral.

### 1. *Appraisal.*

■ Plaintiffs prepared a Farm and Home Plan on August 1, 1992. On October 23, 1992, the County Supervisor revised the Farm and Home Plan to reflect adjustments in plaintiffs' farm operating expenses. These adjustments were based on the plaintiffs' actual costs except for two crops on which County averages were used because of a lack of data from plaintiffs. In no case were any of the costs used in excess of County averages. Pursuant to FMHA Instruction 1951–S loan servicing, on January 14, 1993, FHMA prepared a DALR$ report for plaintiffs' loan accounts. The DALR$ report informed plaintiffs that they were not eligible for restructuring and offered plaintiffs a net recovery buyout of $262,655.00.

Plaintiffs appealed the denial of their application for debt restructuring under Instruction 1951–S. The NAS hearing officer affirmed the denial, concluding in pertinent part:

### FINDINGS OF FACT

A. The appellant prepared a Farm and Home Plan on August 1, 1992. This plan projected a balance of $32,155.80 for debt repayment.

B. On October 22, 1992, under the direction of the County Supervisor, the FMHA revised the Farm and Home Plan that reflected adjustments in Farm Operating expenses. These adjustments were based on the appellant's actual costs, which in all instances were less than County av-

erage costs, except for two crops on which County averages were used because of a lack of data from the appellant. In no case were any costs used that exceeded the County averages. FMHA discussed these changes with the appellant. The appellant acknowledged this discussion but agreement by initials or signature was not obtained from the appellant, since the appellant wished to examine the figures in private.

C. On January 14, 1993, the County Supervisor used the revised Farm and Home Plan to run the ... DALR$ computer program. DALR$ indicated that the appellant had non-FMHA annual debt service requirements of $230,327.00, of which $95,327.00 was undersecured debt. DALR$ indicated that the appellant had FMHA debt service requirements of $173,054.00.

D. On November 3, 1992, Exhibit E to Subpart S of FMHA Instruction 1951–S, 'Notification of Request for Mediation or Meeting of Creditors,' was sent to the appellant. FMHA determined that the appellant's other creditors did not hold a sufficient amount of the appellant's total debt to develop a feasible plan of operation even if the other creditor's [sic] other debts were entirely written off. The appellant did not contest this matter at the appeal hearing. Also, FMHA's decision has met the requirements of FMHA Instruction 1951–S, Section 1951.909(h)(3)(i)(B).

E. On February 8, 1993, the Acting County Supervisor notified the appellant of the denial of primary loan service programs. FMHA offered the appellant a net recovery buyout in the amount of $262,665.00.

### CONCLUSIONS

A. FMHA Instruction 1951–S, Section 1951.909(h) requires that Attachments 5 and 6 of Exhibit A to Subpart S of the 1951–S Instruction will be sent to the appellant when primary loan servicing programs are denied and a Net Recovery Value buyout will be offered by FMHA. The findings of fact verifies that this requirement was met.

B. FMHA Instruction 1924–B, Section 1924.57, requires that the Farm and Home Plan be realistic and based on actual production figures and expenses. The appeal record supports FMHA in its determination that this procedure was followed. The appellant contested the expense figures used by the County Supervisor in the Farm and Home Plan but did not successfully provide evidence that the operating expense figures used by the County Supervisor were in fact error.

C. The appellant's Farm and Home Plan was not feasible, i.e., the balance available was not sufficient to service the annual debt and operating requirements.

D. The appellant's revised Farm and Home Plan was properly entered into the DALR$ program. DALR$ concluded that the net recovery buyout would be offered to the appellant in the amount of $262,-665.00.

*IT IS HEREBY DETERMINED:*

1. FMHA's decision is upheld.

2. The appellant is afforded the opportunity to buyout his loans at the net recovery value of $262,655.00. The appellant has 45 days from the date of receipt of this decision to exercise his buyout option.

.    .    .    .    .

4. The appellant stated at the hearing that he had wished to contest the FMHA appraisal but had not understood the intent of Attachment 5 of the 1951–S FMHA Instruction. However, the appellant did not check this option of Attachment 5, nor did the appellant come prepared to prove that the FMHA appraisal was in error or provide an independent appraisal. However, since the appellant expressed a desire at the hearing to contest the FMHA appraisal, any conclusive evidence that the appellant can offer concerning this matter by a request of a review of this decision should be considered during the review.

5. The appellant has a right to request a further review of this decision.

Plaintiffs appealed this decision to the FMHA's California State Director who affirmed the decision, stating in pertinent part as follows:

On May 4, 1993, the Hearing Officer determined that the Agency correctly offered the opportunity to purchase at the NRBO amount. The appeal record reveals that though there was some disagreement over the expense figures used in the plan, the information is the best information available to prepare a plan. Secondly, we find that even though there were some debts included in the plan which were not those of the debtor the DALR$ used only included the debt service to Anderson Clayton for the current years operating loan. Even with no other debt, except Anderson Clayton, the proposal does not cash flow in an amount sufficient to determine an outcome other than NRBO.

The real estate appraisal is disputed and we have carefully evaluated each of the appraisals which independently support market value. It is noted that there is a significant difference in value between the two findings of value. Each appraisal was referred to the California FMHA Appraisal Systems Manager for review. It was the written opinion of the Appraisal Systems Manager that the March 1, 1992, appraisal findings of Charles Tingley [sic] and Company is well documented and meets the USPAP requirements. The Charles Briggs finding of value as of June 15, 1993, is also well documented, but it omits the income approach to value. Therefore, we find that the Charles Tingley [sic] appraisal is the most accurate finding of value because it uses all three approaches to value in finding a recommended market value. Therefore, we conclude that the NAS hearing decision is correct. This conclusion is based on an exhaustive review of the facts associated with the decision, including listening to the appeal hearing tape, the Hearing Officer's file, the County Officer case file, and the published regulations of this Agency.

Plaintiffs finally appealed to the NAS Director who also upheld the Hearing Officer's decision, rejecting plaintiffs' contention that the figures used by the FMHA on the Farm and Home Plan and the appraised value are in error:

*FINDINGS OF FACT*

.    .    .    .    .

3. The appellants submitted financial information on 2 January 1992 and a farm and home plan dated 1 January 1992. On 18 June 1992 FMHA requested additional information to be submitted not later that 20 July 1992. The appellants requested an extension of time to submit the information. All information necessary to process the request for primary loan servicing was submitted on 6 October 1992.

4. A meeting was held with the appellants on 23 October 1992. The appellants' farm and home plan dated 10 September 1992 was reviewed and discussed in detail during this meeting. FMHA determined that the operating expenses shown on the farm plan were not realistic or an accurate representation of the appellants' 5 year historical average based on the income tax records. The appellants did not keep a record of expenses for each commodity, only for the total farm. The 5 year expense average was based on the appellants' income tax records along with the University of California Extension cost figure for each commodity. The revised plan indicated that the balance available was not sufficient to pay total debt. The appellants did not disagree with the method used by FMHA in computing operating expenses, however, they did not sign the farm plan because they wanted to review it further.

5. FMHA utilized ... DALR$ ... to determine if the appellants' debt could be restructured. DALR$ was run 29 October 1992 excluding all the appellants' undersecured and unsecured creditors and adding $33,900 (capital expenditures shown on farm plan) to the balance available of $103,291. It revealed that the appellants did not have a feasible plan to qualify for primary loan servicing.

6. On 3 November 1992 the appellants were notified by Exhibit E to Subpart S 'Notification of Request for Mediation or Meeting of the Creditors' that FMHA will not schedule a meeting with the others [sic] creditors. The creditors did not hold a substantial amount of the total debt which would permit a feasible plan of operation even if their entire debt was written off. On this same day the appellants were sent a copy of the farm and home plan and the DALR$ calculations.

7. The appellants did not respond to Exhibit E.

8. FMHA prepared a new DALR$ report on 14 January 1993. This report indicated that the appellants are not eligible for debt restructuring. The State Director approved the DALR$ calculations on 2 February 1993.

9. Attachments 5 and 6 of Exhibit A, Notice of Intent to Accelerate and Response to Notice, were sent to the appellant on 8 February 1993. Attachment 5 specified buy out of the loans at the net recovery value as established by DALR$.

10. The appellant returned Attachment 6 of Exhibit A, requesting an appeal hearing. They also sent a letter dated 3 March 1993 stating that they would like to appeal the decision and that they found some figures that were put in incorrectly that need adjusting.

11. A meeting was held on 18 March 1993. FMHA notified the appellants by letter dated 19 March 1993 that the information provided during the meeting did not improve their financial picture to make primary loan servicing possible.

*CONCLUSIONS*

1. FMHA Instruction 1951–S, section 1951.909 requires the County Supervisor to use DALR$ to attempt to find the combination of loan service programs that will result in a feasible plan for borrowers who request loan servicing. The plan must show that the borrower will be able to pay all operating expenses and all taxes, meet scheduled payments on all debts and provide living expenses for family members. A feasible plan as defined in 1951.906 is a plan based upon the borrower's actual records that show the farming operation's actual income, production and expenses. Income tax returns and supporting documentation are reviewed to verify the borrower's actual records. The records, including income tax records must represent the most recent five-year period.

The farm and home plan dated 10 September 1992 was based on the appellants' 5 year history of income, production and expenses. Additionally, the appellants' income tax records for the years 1987 through 1991 and the UC Extension cost figures were also considered.

2. The Hearing Officer stated in his decision dated 4 May 1993 that 'since the appellants expressed a desire at the appeal hearing to contest the FMHA appraisal, any conclusive evidence that the appellants can offer concerning this matter by a request of a review of this decision should be considered during the review.' The appellants did not check the appropriate option on Attachment 6 to indicate they were interested in obtaining an independent appraisal nor did the appellants submit an independent appraisal during the appeal hearing. The Hearing Officer does not have the authority to state that any information submitted by the appellants refuting the FMHA's appraisal should be considered during the review process.

3. The State Director reviewed both the FMHA appraisal and the independent appraisal. He determined that the FMHA appraisal was well documented and meets the USPAP requirements. The independent appraisal was also well documented, but omitted the income approach to value. Therefore, the FMHA appraisal is considered to be the most accurate. The appellants were so notified of these findings by letter dated 14 September 1993.

4. The reason for the denial of primary loan servicing is supported by the evidence and in accordance with regulations.

Plaintiffs contend that the FMHA's decision to rely on the appraisal prepared by Stanley Xavier of Charles Tingey and Company prepared on March 1, 1992 (hereinafter referred to as the Xavier appraisal), showing a fair market value of $305,000.00, was arbitrary and capricious because the FMHA did not believe that this appraisal was accurate.

In arguing that the reliance on the March 1, 1992 Xavier appraisal was arbitrary and capricious, plaintiffs refer to the fact that an appraisal of the property requested by the FMHA and prepared by Hugh Macklin on May 17, 1989 appraised the value of the property at $208,000.00. Plaintiffs further refer to an appraisal prepared by Charles Briggs on June 15, 1993 at plaintiffs' request which appraised the property at $194,000.00 Plaintiffs further refer to a memorandum dated August 18, 1993 from FMHA's Appraisal Systems Manager to the Acting Chief of the FMHA Farmer Program in Woodland reviewing the March 1, 1992 Xavier appraisal and the appraisal prepared by Charles Briggs on June 15, 1993:

This case is very puzzling, two appraisers looked at the same property, one saw one thing and the other saw something else. Beauty apparently is in the eye of the beholder.

The major differences in these reports are: In the first [the Xavier appraisal], the appraiser indicates that the vines are in good condition and the farm reflects good cultural practices. In the later report [the Briggs appraisal], the appraiser indicates that the vines are in poor condition having little value and the property is overrun with weeds, and in general shows poor cultural practices.

In the earlier report, the appraiser indicates that the buildings have substantial value, while in the later report, the appraiser indicates that they have little value. The buildings they describe as being on the farm do not agree.

The principle other variation is in the selection of comparable sales. The sales in the 1992 report indicate a value to the open farm land of $3,800 per acre. In the 1993 report, the sales indicate a value to the same ground of only $2,600 per acre. In the first report, the vines are valued at $6,000 per acre, and in the letter [sic], he values them at only $3,733 per acre due to their poor condition. They each used different sales.

Part of the problem obviously is that they saw the property approximately 20 months apart. One in early spring and the other in mid-summer.

The first appraisal is well-documented and meets USPAP. The recent report omits the income approach, otherwise, it is adequately documented except he omits his

State Certification Number and does not include the certification required by US-PAP. I checked and he does have a valid General Certification.

I cannot form an opinion on the validity of either one of these reports without doing a field review. From the basis of the desk review, only the 1992 appraisal is the best documented if a 1992 value date is of use to you.

Plaintiffs further refer to a facsimile transmission to Nels Christensen in Woodland from Tom Roberts, County Supervisor, of handwritten notes of an field appraisal review dated August 24, 1993. These field appraisal review notes state in pertinent part:

North block of open land has been planted in 1993 to vineyard—no stakes or wire yet.

These are interplanted between cotton— 2 rows cotton, 1 row vines.

No valves for vineyard in this portion.

Vineyard block—average condition, age of vines estimated at 10 yrs.

Crop est. at 7–8 ton green per acre.

Vines appear uniform for age. Very few missing.

No weed problem noted, vineyard being irrigated.

Small berry size, acceptable for wine grapes.

Mobile home—R.E. or personal property.

Average condition (agree with Tingey— also on valuation).

Both appraisers missed some newer, closer comps. Based upon [undecipherable] used in Agueda, the open ground would most likely value between $2700–3000 acre. This is higher than in Briggs' appraisal, but lower than in Tingey's appraisal. The vineyard ground was valued by Tingey at $5800/ac which appears reasonable. This is again higher than in Briggs appraisal. Vineyard $5000–5800 value reasonable based on condition and value ratio for open land of subject area vs. Kingsberg/Selma area.

The field appraisal review notes contain a "quick value" estimate of $235,700 (vineyard—10.6 acs @ 5500/ac—$58,300; open land—56 acs @ 2700/ac—$162,400; buildings and shop—$15,000). The field appraisal review notes also set forth a "reasonable value" estimate of $245,000–$250,000. Finally, plaintiffs refer to an appraisal prepared by Xavier on January 25, 1994, i.e., after the final denial of plaintiffs' appeal, appraising the property at $280,000.00.

Plaintiffs argue that this evidence shows that the FMHA did not believe that the $305,000.00 appraisal was accurate. Plaintiffs contend that this matter should be remanded to resolve this issue by appraising the property at $235,700.00, the amount estimated by the field appraisal to the "quick value" estimate.

■ The court concludes that plaintiffs have not shown that it was arbitrary and capricious for the FMHA to rely on the Xavier appraisal. Recognizing that this court may not substitute its judgment for that of the FMHA, plaintiffs have not shown that the factors relied upon in accepting the Xavier appraisal over the Briggs appraisal was arbitrary and capricious. It is apparent from the field appraisal notes that the Briggs appraisal was found to be inaccurate in its descriptions of the condition of the property and that most of the figures used in the Xavier appraisal were accurate. Plaintiffs do not address the failure of the Briggs appraisal to use more than one method of determining the fair market value.[2]

### 2. *Farm and Home Plan.*

■ Plaintiffs further argue that the FMHA's use of the 1992 Farm and Home Plan was arbitrary and capricious because the data contained in that plan is inaccurate. Plaintiffs contend that the expenses are overstated and improperly categorized and that the income is inflated.

In so arguing, plaintiffs refer the court to a DALR$ report prepared on their behalf by

---

**2.** Defendants argue that plaintiffs' failure to submit an independent appraisal to the Hearing Officer in accordance with regulations is another ground for denying plaintiffs' motion. However, the FMHA considered the Briggs appraisal at the higher levels of appeal. Therefore, any failure to fully comply with regulations and procedures is moot.

Klahoma Family Farm & Rural Services on September 23, 1991 and based on the Farm and Home Plan submitted to the FMHA in 1991, the FHMA's Farm and Home Plan, and the Chapter 12 bankruptcy plan. This DALR$ report finds that the total FMHA payments is $343,213 and the balance available is $366,275. The report states that the balance available is sufficient to service all planned payments to non-FMHA creditors and a $19,8845 payment to FMHA with a cash flow margin of $3,217.00.

■ Plaintiffs have not articulated the specifics of their position that the FMHA's use of the Farm and Home Plan it did use was arbitrary and capricious, i.e., which expenses are overstated or improperly categorized and why and what income is inflated and why. The fact that there are two alternatives in the administrative record does not mean that the FMHA's use of the one less favorable to plaintiffs was arbitrary and capricious.

In any event, defendants note that the FMHA may properly use county-wide averages for the annual income and costs of bringing in the various crops a borrower intended to grow when the borrower is unable to document his contentions as to costs and income. 7 C.F.R. § 1924.57(d).

The court concludes that plaintiffs have not shown that the use of the 1992 Farm and Home Plan was arbitrary and capricious.[3]

ACCORDINGLY, IT IS ORDERED that plaintiffs' Motion for Summary Judgment is denied and that defendant's Motion for Summary Judgment is granted.

JUDGMENT FOR DEFENDANT TO BE ENTERED.

---

[3.] Plaintiffs argument that the defendants' actions deprived plaintiffs of their property rights without due process of law in violation of the Fifth Amendment is moot.